UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
SANDRA ESTELA-RIVERA,

                       Plaintiff,

                 - against -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,


                   Defendant.
--------------------------------------------------------X
PAMELA K CHEN, United States District Judge:

**MEMORANDUM & OPINION**

Case No. 13 CV 5060 (PKC)

     Plaintiff Sandra Estela-Rivera ("Estela-Rivera" or "Plaintiff") commenced this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Defendant Carolyn Colvin, Commissioner of Social Security (the "Commissioner") denying Estela-Rivera's claim for Social Security disability benefits. (Dkt. 1.) The Commissioner moves for judgment on the pleadings, affirming her decision, and Estela-Rivera cross-moves for judgment on the pleadings, reversing the Commissioner's decision and remanding for a new hearing and decision. (Dkt. 18, 21.) For the reasons set forth below, the Court grants Estela-Rivera's cross-motion, and denies the Commissioner's motion.

**BACKGROUND**

I.    **Claimant's Preliminary History and Employment History**

     Plaintiff was born on September 26, 1970. (Tr. 135.) In 1992, at the age of 21, Plaintiff suffered a cerebrovascular accident ("CVA"), commonly known as a stroke, which was the start of her chronic history of blood disorder. (Tr. 296.) Plaintiff underwent brain magnetic

---

[1] "Tr." refers to the Administrative Transcript, Dkt. 6.

resonance imaging ("MRI") in September 24, 1992 and October 1, 1992, which showed infarction in the distribution of the right posterior cerebral artery ("PCA"), right posterior thalamus, and right occipital cortex. (*Id*.) She was diagnosed with a potential factor X deficiency (a blood disorder causing clotting) and placed on Coumadin therapy.2 (*Id*.) Unfortunately, Plaintiff discovered that she was pregnant while on Coumadin and the pregnancy had to be aborted. (*Id*.) A 1994 follow-up MRA3 indicated normal results, and Plaintiff ceased taking Coumadin approximately at that time. (*Id.*, Tr. 266.) She also married about that time, at age twenty-four. (Tr. 22.) In 2003, Plaintiff suffered a severe right temporal headache. (Tr. 297.) A follow-up brain MRI on August 26, 2003 showed an old right PCA infarction, as well as a difficult-to-characterize focal intensity in the superior mid pons that could indicate a focal acute small infarction. (*Id.*)

Plaintiff graduated high school, and obtained a bachelor's degree in international marketing at Baruch College in 1998. (Tr. 23, 181.) Plaintiff worked as a contracts administrator for Fidessa Corporation from May 2004 to October 2006, as a marketing and logistics manager for Maruberi America Corporation from October 2006 to August 2007, and as cashier at a retail store, the Children's Place, from October 2009 to May 2010. (Tr. 172, 180.) She has a history of sustained and continued employment, as indicated by the record of her gross annual wages from 1985 to 2010. (Tr. 157-167.) Plaintiff married at the age of 24, and has two daughters, ages 15 and 12. (Tr. 22.) She and her family live in Staten Island. (*Id.*)

---

[2] Coumadin therapy uses the drug Coumadin, generically named Warfarin, to prevent harmful blood cuts and slow blood coagulation time. Karen Fiumara & Samuel Z. Goldhaber, *A Patient's Guide to Taking Coumadin/Warfarin*, www.ahajournals.org/content/119/8/e220.full

[3] An MRA, or magnetic resonance angiogram, is a type of MRI that provides a picture of a person's blood vessels. *See* www.webmd.com/heart disease/magnetic-resonance-angiogram-mra (last viewed on August 16, 2015).

## II.     Treating Physician Medical Evidence

### A.     Evidence Prior to Plaintiff's Alleged Onset Date of May 1, 2010

On November 2, 2009, Plaintiff went to the Staten Island University Hospital's ("SIUH") emergency room, complaining of a headache with sensitivity to light, nausea, and dizziness. (Tr. 228-36.) Upon examination, Plaintiff was alert, cooperative, fully oriented, and in no acute distress. (Tr. 229, 232.) The attending physician noted her history of a CVA in 1992 and factor X deficiency. (Tr. 231.) A lumbar puncture (spinal tap) was performed on Plaintiff, with negative results. (Tr. 232, 297.) A computed tomography ("CT") scan of Plaintiff's brain and head, taken the same day, showed findings of venous thrombosis, consistent with an old infarct in the medial right occipital lobe. (Tr. 234, 253.) Plaintiff was discharged to her home in improved condition. (Tr. 230, 232.)

On November 5, 2009, Plaintiff saw neurologist Michael Ng, M.D., for evaluation of her continuing severe headache. (Tr. 296-98.) The headache had begun four days earlier, with nausea and photo and phonophobia. (Tr. 297.) Dr. Ng noted her prior history of CVA and headaches, as well as the results of her November 2, 2009 CT scan at SIUH showing an old infarct. (*Id.*) Dr. Ng found Plaintiff had left upper quadrantanopsia, *i.e.*, she had partial blindness in the upper left quadrant of her field of vision, and some muscular weakness in the left deltoid. (Tr. 298.) Plaintiff was otherwise physically normal throughout the rest of the examination. (*Id.*) Dr. Ng assessed Plaintiff as having an old right-sided PCA stroke at age 21; a "questionable" factor X deficiency, noting that Plaintiff was not currently on antiplatelet or anticoagulation therapy; and right-sided fronto-temporal headache with a migrainous-type quality. (*Id.*) Dr. Ng recommended evaluation for venous sinus thrombosis, arterial thrombosis, and/or any other structural brain pathology, to determine whether the headache might indicate

another stroke, rather than simply a migraine. (*Id.*) Dr. Ng prescribed Indocin and seven days of Prednisone, to be tapered.

Dr. Ng additionally ordered a MRI, a MRA, and a magnetic resonance venography ("MRV") all to be taken of Plaintiff's brain. (*Id.*) The November 6, 2009 MRI showed chronic signal changes in the right occipital lobe, likely due to remote infarction; possible chronic lacunar infarct in the right thalamus; and low lying cerebellar tonsils without frank Chiari malformation[4]. (Tr. 276.) The MRA showed no evidence for intracranial vascular stenosis. (*Id.*) However, the radiologist noted some mild bulbous prominence of the anterior communicating artery and focal prominence of the basilar artery origin of the left posterior cerebral artery, and recommended a CT angiogram brain scan to rule out a possible aneurysm. (Tr. 275; *see* Tr. 238.) The MRV of the same date found nonvisualization over a portion of the left posterior transverse sinus, which could reflect focal left transverse sinus thrombosis. (Tr. 275-77.)

On November 10, 2009, Plaintiff returned to SIUH, complaining of a severe headache that woke her from sleep. (Tr. 237-52.) The pain from the previous days' headache had migrated into her shoulders. (Tr. 237.) Dr. Ng sent her to the hospital for anticoagulation therapy and to rule out a possible aneurysm. (Tr. 239.) A November 11, 2009 CT angiogram showed no evidence of aneurysms or stenosis. (Tr. 248; *see also* Tr. 239.) A November 12, 2009 echocardiogram showed normal left ventricle systolic function, with an ejection fraction of 55% to 65%, and tricuspid regurgitation of 1+. (Tr. 251-52; *see also* Tr. 239.) On examination, Plaintiff was awake, alert, and fully oriented, with lungs, cardiovascular system, abdomen, extremities, and neurologic all functioning within normal limits. (Tr. 238, 243-44, 246-47.) Her

---

[4] A Chiari malformation is "a condition in which brain tissue extends into [a person's] spinal canal. http://www.mayoclinic.org/diseases-conditions/chiari-malformation/basics/definition/con-20031115 (last visited on August 16, 2015).

basic metabolic profile was within normal limits; and her protein-S and protein-C functions were normal. (Tr. 238-39.) Plaintiff was started on Heparin and Coumadin. (Tr. 239.) Plaintiff had no further headaches and had no bleeding on anticoagulation, and was discharged on November 15, 2009 in stable condition. (*Id.*) The diagnosis on discharge was that her headache had indicated cerebral venous thrombosis ("CVT")[5], to be treated by anticoagulation therapy; that Plaintiff had a history of CVA 18 years earlier; and that hypercoagulable state was ruled out. (*Id.*) Plaintiff was instructed to continue anticoagulation therapy with Coumadin and to follow up with Dr. Ng and the anticoagulation clinic; her goal INR[6] was between 2 and 3. (*Id.*)

On November 16, 2009, Plaintiff again saw Dr. Ng, reporting no headaches. (Tr. 299.) The notes are partly illegible. He assessed CVT, likely hypercoagulable state, and a CVA at age 21. (*Id.*)

On November 19, 2009, Plaintiff started at the SIUH anticoagulation clinic (Tr. 266.) Plaintiff had been on Coumadin following a CVA 17 years earlier, but had been off Coumadin for the past 15 years. (*Id.*) Plaintiff's INR on that date was 1.2. (*Id.*) Plaintiff's prescribed Coumadin dosage increased, and she was told to avoid Vitamin K in foods.[7] (*Id.*)

From November 19, 2009 through December 19, 2011, Plaintiff attended the outpatient anticoagulation clinic treatment 70 times. (Tr. 215-16.) Her INR was out of range on 32 occasions, with a one-time high of 6.1 on November 28, 2011, and a one-time low of 1.1 on June

[5] According to the American Heart Association and American Stroke Association, CVT is an "uncommon form of stroke." Gustavo Saposnik et al., *Diagnosis and Management of Cerebral Venous Thrombosis*, Stroke, Apr. 2011, at 1158-59.

[6] INR, or international normalized ratio, is the standard metric to express the time it takes blood to clot. *See A Patient's Guide to Taking Coumadin/Warfarin*, *supra* at footnote 6.

[7] Vitamin K inhibits the action of Coumadin in adjusting blood coagulability. *A Patient's Guide to Taking Coumadin/Warfarin*, *supra* at footnote 6. Where Coumadin increases coagulation time, making clots less likely and increasing the likeliness of bleeding, Vitamin K decreases bleed time and encourages blood clotting. (*See id.*, Tr. 266-74.)

9, 2010. (*Id.*) Prior to her alleged onset date, Plaintiff was advised on several occasions at the clinic to either change her Coumadin dosage or adjust her intake of Vitamin K foods to adjust her INR levels. (Tr. 268, 272.) The clinic repeatedly counseled Plaintiff on the risks of having an INR either too high or too low. (Tr. 268-74.) Too high, and excessive bleeding might occur; too low, and a blood clot might form that could again cause a stroke. (*Id.*) Plaintiff was compliant with treatment, and verbalized her understanding of the instructions. (Tr. 269.)

On January 29, 2010, Dr. Ng again saw Plaintiff, who reported no recent headaches. (Tr. 285.) Rather, she reported dizzy spells, with the last one having occurred on January 5, 2010. (*Id.*) She reported that she was exercising, eating healthier, and taking Coumadin. (*Id.*) Her examination was within normal limits. (*Id.*) Her INR was 2.2. (*Id.*) Dr. Ng confirmed an assessment of CVT, a protein-S deficiency with slight beta-2 glycoprotein, and CVA at age 21. (*Id.*) He recommended that Plaintiff continue life-long Coumadin use to keep her INR in the 2-3 range. (*Id.*)

### B. Evidence on or after Alleged Onset Date of May 1, 2010

#### 1. Dr. Ng

Dr. Ng ordered another round of brain imaging for Plaintiff which was conducted on May 13, 2010 (an MRI, MRV, and MRA). (Tr. 278.) All of the studies showed no significant change from Plaintiff's November 6, 2009 brain studies. (Tr. 278-30, 287, 288-90.) There was no evidence of aneurysms or stenosis. (Tr. 289.) The MRI impression showed no acute infarct and only an old lacunar infarct in the right thalamus. (Tr. 287.) There were signs consistent with encephalomalacia and/or gliosis in the right occipital lobe most likely from prior old ischemic changes. (*Id.*) The MRV showed no signal flow enhancement in the left transverse sinus, which could represent slow or no flow. (Tr. 278.) There was normal signal flow in the superior sagittal

sinus, bilateral sigmoid sinuses, internal jugular veins, bilateral internal cerebral veins, basal veins, and veins of Galen.  (*Id.*)

On May 20, 2010, Dr. Ng met with Plaintiff to discuss the laboratory data.  (Tr. 283.)  Dr. Ng noted that Plaintiff's recent MRI/MRA/MRV studies showed no change.  (*Id.*)  Plaintiff reported taking Ibuprofen the past four days for headaches.  (*Id.*)  Examination was within normal limits with some shoulder tenderness.  (*Id.*) Her INR was 4.3.  (*Id.*)  Dr. Ng's assessment and recommendations were mostly unchanged from his 2009 assessment, but the record is partly illegible and any additional changes cannot be read. (*Id.*)

Plaintiff underwent another set of imaging tests to follow-up on her blood clot condition in October 2010. On October 29, 2010, brain MRI and MRV studies revealed no significant change from the May 13, 2010 study.  (Tr. 300-02.)

In 2012, after Plaintiff's administrative hearing with the ALJ, Dr. Ng responded to the ALJ's request for more development of Plaintiff's medical record of physical impairments with a letter. The full text of the letter is reproduced here:

> Ms. Rivera is under my care for the treatment of severe headaches four to five times a month. She is taking Tramadol which seem [*sic*] to keep them under control.
>
> If you have any questions please feel free to contact my office.  (Tr. 360.)

### 2. Dr. Auyeung

On May 13, 2010, Plaintiff saw Dr. Nelson Auyeung, M.D.[8]  (Tr. 291-93.)  Plaintiff reported persistent pain and shoulder pain.  (Tr. 292.)  The entry is mostly illegible. Plaintiff continued to see Dr. Auyeung regularly after her alleged onset date for general care, visiting him

---

[8] The record indicates that Dr. Auyeng's practice is in pediatrics, infectious diseases and allergies. (Tr. 294.)

four more times in 2010.  (Tr. 292-93.)  Dr. Auyeung prescribed Plaintiff, *inter alia*, Ambien and

Zoloft, in September 2010 and January 2011, respectively.  (Tr. 218-19.)  By August 29, 2011,

Dr. Joel Breving, a psychiatrist, had begun to address Plaintiff's antidepressant regimen.  (Tr.

219.)  Dr. Auyeung continued to refill Plaintiff's Ambien prescription for her until at least

December 13, 2011.  (*Id.*)

### 3. Dr. Breving

Plaintiff began seeing Dr. Breving for symptoms of mental illness on April 29, 2011.

(Tr. 343.)  Dr. Breving reported that he saw Plaintiff monthly to follow up on her medications.

(Tr. 344.)  On December 19, 2011, Dr. Breving completed a Mental Impairment Questionnaire.

(Tr. 343-48.)   He listed her symptoms as appetite disturbance with weight change; sleep

disturbance;  emotional  lability;  anhedonia;  psychomotor  agitation  or  retardation;

guilt/worthlessness;  difficulty  thinking  or  concentrating;  social  withdrawal  or  isolation;

decreased energy; and blunt, flat, or inappropriate affect.  (Tr. 343-44.)  Dr. Breving reported

clinical findings of significant dysphoria, sadness, depressed mood, anxiety, psychomotor

retardation, and social isolation.  (Tr. 344.)  Dr. Breving noted that Plaintiff had been prescribed

Zoloft, which had improved her condition without any side effects.  (Tr. 345.)   Dr. Breving

reported Plaintiff as having major depressive disorder that was moderate and recurrent.  (Tr.

343.)  Dr. Breving also gave Plaintiff a global assessment of functioning ("GAF") of 75.[9]  (Tr.

---

[9] "GAF refers to a person's overall level of functioning and is assessed using a scale that provides ratings in ten ranges, with higher scores reflecting greater functioning."  *Corporan v. Comm'r of Soc. Sec.*, 12 CV 6704, 2015 WL 321832, at *12 n.9 (S.D.N.Y. Jan 23, 2015) (citing *Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV–TR") at 27 (4th ed., text revision, 2000)).  A GAF between 71 and 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g. difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning."  *Id*. at 34.

343.) He opined that Plaintiff's prognosis was "fair" and that her condition was expected to last at least 12 months. (Tr. 346.)

Dr. Breving opined that Plaintiff's impairment or treatment would cause her to be absent from work about once per month. (*Id.*) Plaintiff did not appear to have any reduced intellectual functioning. (*Id.*) He assessed that Plaintiff had moderate restriction in activities of daily living; marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence, or pace; and had once or twice experienced an episode of deterioration or decompensation in a work or work-like setting. (Tr. 347.) He opined that Plaintiff would have difficulty working at a regular job on a sustained basis because she had decreased abilities to interact with peers or the public, respond appropriately to supervisors, organize/set realistic goals, and understand simple/complex instructions. (Tr. 346.)

### III. Consultative Medical Evidence

#### A. Dr. Chitoor Govindaraj

On December 14, 2010, Dr. Chitoor Govindaraj, M.D., performed a consultative medical examination of Plaintiff. (Tr. 312-15.) Plaintiff reported to Dr. Govindaraj that she had stopped working between November and December 2010. (Tr. 312.) She claimed to have blood clots in 1992 and November 2009, and that the second time she was diagnosed with protein-S deficiency disorder, and placed on lifelong anticoagulation therapy. (Tr. 312-13.) She also reported taking Ambien for sleep as needed, and Ultram for headaches as needed. (Tr. 313.) On examination, Dr. Govindaraj found normal lungs; absence of heart murmur, gallop, click, or rub; normal range of motion in the spine and joints; ability to bend down and touch the floor; normal straight leg raising; no evidence of muscle spasm; cranial nerves within normal limits; normal motor system, sensory system, and reflexes; normal hand dexterity; normal gait; normal posture; no need of a

cane for ambulation; and no cyanosis, clubbing, contractures, instability, redness, edema, heat or swelling. (Tr. 313-14.) Dr. Govindaraj diagnosed history of protein-S deficiency disorder with some cerebral blood clot in the brain, on anticoagulation therapy. (Tr. 314.) He opined that Plaintiff's prognosis was good, that she was medically stable, and that she was cleared for occupation without restriction. (*Id.*)

**B.      Dr. Radha Sankar**

On December 14, 2010, Dr. Radha Sankar, M.D., performed a consultative psychiatric evaluation of Plaintiff. (Tr. 316-18.) Plaintiff denied major depression or any prior psychiatric history. (Tr. 317.) She reported sleep difficulties, treated with Ambien; inconsistent appetite; feeling very fatigued all of the time; and severe pain in her shoulders. (Tr. 317.) She reported that, when she had a headache, she felt fatigued, irritable, and depressed, and would isolate herself, but that she otherwise felt pretty good about herself. (*Id.*) She reported last working in December 2010. (*Id.*) She had two children in grade school and middle school. (*Id.*) Plaintiff stated that when she had a headache and backache, her ability to function became somewhat limited, but she was otherwise able to cook, clean, shop, and take care of her children. (Tr. 318.) Plaintiff reported that she had driven herself to the consultative examination. (Tr. 316.)

Dr. Sankar's mental status examination showed that Plaintiff was cooperative, fully oriented, neatly dressed, and comfortable, with good eye contact; and that her speech was spontaneous, coherent, and relevant. (Tr. 317.) Dr. Sankar perceived no thought disorder; no hallucinations or delusions; neutral mood; appropriate affect. (*Id.*) Plaintiff maintained adequate intellectual functioning, a "good" fund of knowledge, "good" abstraction, ability to do serial 7s with "some difficulty," "good" recent and remote memory, with the ability to recall three digits forward and backward without difficulty, good insight, and adequate judgment. (*Id.*) Dr. Sankar

diagnosed no mental impairments, only noting that Plaintiff was being treated for a blood disorder. (Tr. 318.) She stated that Plaintiff had a history of stroke treated by anticoagulants, and that she went through mood changes depending on how she felt physically, with severe headaches and shoulder pains. (*Id.*)

Dr. Sankar opined that Plaintiff was able to take care of herself and had no major psychiatric problems. (*Id.*) Dr. Sankar's opinion was that Plaintiff could not maintain a regular schedule or learn new tasks, but could follow and understand simple directions, perform simple tasks, and did not have difficulty maintaining concentration or attention. (*Id.*)

### C. Dr. Yakov Burstein

On December 27, 2010, state agency psychological consultant, Dr. Yakov Burstein, Ph.D., completed a Psychiatric Review Technique, by consulting Plaintiff's medical records. (Tr. 319-32.) He found no severe mental impairment. (Tr. 319.)

### IV. Non-Medical Evidence

### A. Barbara Fried, LCSW

On March 5, 2011, Plaintiff saw a therapist[10] at New Pathways Counseling Center ("NPCC"). (Tr. 355-56.) Plaintiff reported that she had no prior counseling. (Tr. 355.) She complained of stressful medical problems. (Tr. 356.) She had headaches and was depressed when she was unable to do what she needed to do. (*Id.*) Her primary care physician, Dr. Auyeung, had prescribed Ambien for sleep issues, but she did not like it. (*Id.*) She reported a loss of interest in everything. (*Id.*) She reported that she had recently been prescribed Zoloft, but admitted that she had not been taking it consistently. (*Id.*) The therapist found adjustment issues with depressive symptoms. (*Id.*)

---

[10] This therapist was not identified in the record.

On April 2, 2011, at NPCC, Plaintiff saw social worker Barbara Fried, LCSW. (Tr. 357.) Plaintiff complained of feeling lethargic and having no interest in anything. (*Id.*) She was concerned about her children doing well in school. (*Id.*) On April 11, 2011, Plaintiff saw Fried and reported sleeping poorly. (*Id.*) She stated that she stayed at home, did not socialize, worried about her children's values, and had difficulty doing her chores. (*Id.*) On April 18, 2011, Plaintiff saw Fried, reporting that she had experienced two strokes and was depressed, tired, and anxious as a result of her continued medical concerns, and that she had frequent headaches that caused her to be incapacitated. (*Id.*) On June 9, 2011, Plaintiff reported to Fried that she was very happy with her children's progress in school. (Tr. 358.) She enjoyed coming into the city when she was feeling well, and loved to show her children new things, but these trips were infrequent. (*Id.*) Fried noted that "[Plaintiff's] fears seem to focus on her children." (*Id.*) On July 26, 2011, Plaintiff visited Fried and reported that she rested during the day and was taking medications for anxiety, but experienced panic attacks and dizziness at times. (*Id.*) Fried noted that Plaintiff appeared more relaxed. (*Id.*)

On October 18, 2011, Plaintiff returned to Fried. (Tr. 359.) Plaintiff reported that she had called for an appointment because she felt anxious. (*Id.*) She reported that she sometimes thought she might be pressuring her children too much, but felt that this was the proper way to raise children. (*Id.*) On December 13, 2011, Plaintiff visited Fried once more, discussing cousins from whom she had grown distant due to an inheritance that had been left to her. (*Id.*)

On January 18, 2012, Fried completed a mental impairment questionnaire on Plaintiff. (Tr. 349-54.) She noted that her contact with Plaintiff had been "sporadic." (Tr. 349.) Fried assessed Plaintiff as having a GAF of 60, and that in the past year, Plaintiff's highest GAF was 62. (*Id.*) Fried listed Plaintiff's symptoms as severe headaches, sleep disturbance, emotional

lability, recurrent panic attacks, social withdrawal or isolation, decreased energy, persistent irrational fears, generalized persistent anxiety, hostility, and irritability. (Tr. 349-50.) Under "Clinical Findings," Ms. Fried noted that Plaintiff reported joint pains in her shoulders and wrists, nosebleeds, bruising easily, a second, recent stroke, and side-effects from medications. (Tr. 350.) Plaintiff was consequently anxious and fearful, and she experienced panic attacks. (*Id.*) Ms. Fried stated that Plaintiff's psychiatrist's notes would document the side-effects of Plaintiff's medication. (Tr. 351.) Plaintiff's issues were chronic, but she was cooperative and responsive to treatment. (*Id.*) Fried found that Plaintiff's prognosis was "guarded to fair," and her impairment was expected to last at least 12 months. (Tr. 352.) She opined that Plaintiff's impairments or treatment would cause her to be absent from work more than three times per month. (*Id.*) She assessed that Plaintiff had a marked restriction of activities of daily living; moderate difficulties in maintaining social functioning; and frequent deficiencies of concentration, persistence, or pace; and that Plaintiff continually experienced episodes of deterioration or decompensation in work or work-like settings. (Tr. 353.) Ms. Fried opined that Plaintiff would have difficulty working at a regular job on a sustained basis because she had a blood disorder that caused clots and had resulted in two strokes. (Tr. 352.)

### B. Plaintiff's Self-Reporting and Testimony

In a function report dated September 28, 2010, a few months after her claimed onset date of May 1, 2010, Plaintiff reported that she had no memory trouble. (Tr. 194.) She had no difficulty paying attention, and she had no problem following spoken or written instructions, or getting along with bosses or people in authority. (Tr. 195.) Plaintiff reported spending time with her family and keeping in touch with friends by telephone and computer daily. (Tr. 192.) She no longer socialized with friends outside of her house, spending most of her time at home, out of

her concern for tiring easily and occasional embarrassment from her visible bruises. (Tr. 192-93.) Similarly, Plaintiff could no longer pursue her hobby of running, because she tired too easily and it was painful and dizzying. (Tr. 192.) Plaintiff could not stand or sit for long periods at a time without pain or risk of blood clots. (Tr. 189.)

Plaintiff reported that she could iron and wash dishes. (Tr. 190.) She did not need help to take care of her personal needs or medication regimen. (*Id.*) She went out five times a week, either walking or driving, and she could go out alone. (Tr. 191.) She went grocery shopping about an hour each week. (*Id.*) However, she needed help to carry and put away the groceries once home. (Tr. 190.) She could walk one block before requiring rest, and did not need any device to aid her mobility. (Tr. 195.) Plaintiff occasionally suffered blurred vision. (Tr. 194.) She avoided handling knives due to the risk of excessive bleeding, which impeded her ability to cook. (Tr. 190.) At times Plaintiff was too weak or dizzy to dress herself or get in and out of the shower without help from her husband. (Tr. 189.)

A year and a half later at the January 27, 2012, ALJ hearing, Plaintiff testified that she could no longer work because she had experienced two strokes before turning age 40, the second one occurring in November 2009. (Tr. 23.) She had been diagnosed with protein-S deficiency, which caused her blood clots, and accordingly, she was on indefinite anticoagulant Coumadin therapy. (Tr. 23, 26.) Occasionally, Plaintiff had to take Heparin in conjunction with Coumadin to control her coagulation levels. (Tr. 27.) If her INR became too high, she developed bruising on her legs and back, became very tired, had shoulder and wrist pain, and had nosebleeds and bleeding gums. (*Id.*) She reported that, in the prior three months, her INR had been all over the chart, and that she had experienced her highest record INR yet. (Tr. 28.)

In November 2011, Plaintiff became depressed and anxious. (Tr. 30.) At that time, she began seeing a psychiatrist and a therapist at the recommendation of her primary care physician. (Tr. 23, 30.) Her primary care physician also prescribed her Zoloft. (Tr. 30.) Plaintiff also took Ambien by prescription for her sleep problems, which her physician explained to her as a reaction to bodily stress. (Tr. 23, 189.) The Ambien caused her to wake up in the morning feeling groggy and unfocused. (Tr. 23.) Plaintiff felt unsafe to drive in the morning, so she could not drive her children to school. (Tr. 28.) Plaintiff had recurring monthly episodes as of the date of the hearing, in which she locked herself in her room and became incapable of socializing and interacting with others, including her children. (Tr. 30-31.)

At the hearing Plaintiff also testified that the strokes affected her peripheral vision on her left side. (Tr. 25.) She also testified to experiencing severely painful headaches since her second stroke that did not respond to over-the-counter medication, for which her neurologist prescribed Ultram. (Tr. 24.) When Plaintiff suffered a headache, she would have to lie down for an hour or two at a time, because the Ultram gave her a "dizzy druggy feeling." (Tr. 26.) If the headache persisted, she would take more medicine after four to six hours. (*Id.*) She stated that she took Ultram two to three times per week. (Tr. 25.)

Plaintiff testified that she did not have a problem sitting. (Tr. 30.) She estimated that she could comfortably lift about 20 pounds. (*Id.*) She could walk about three blocks, unless her INR was too high, in which case, her joints hurt, and she could not walk even one block. (Tr. 29.) She estimated that she could stand for 30 or 40 minutes at a time. (*Id.*)

Plaintiff testified that she lived with her husband and children in a home. (Tr. 22.) On a typical day, she woke up and dressed her daughters for school. (Tr. 28.) She walked each one separately one block to the bus stop and helped them with their homework in the evenings. (*Id.*)

Plaintiff usually took a nap each day, because she was groggy from her Ambien. (Tr. 28.) Usually she slept for about an hour, but sometimes she slept all day until her husband returned from work. (Tr. 28, 30-31.) She cooked dinner two or three times per week, when she felt she had enough energy, but otherwise her husband cooked. (Tr. 28-29.) She went to the grocery store about once per week, sometimes with her husband. (*Id.*) She did laundry, but she relied on her husband to carry the laundry bin up and down the stairs. (Tr. 29.)

Plaintiff had traveled to the hearing using public transportation. (*Id.*) She had a driver's license, and drove locally about once a week, including to the supermarket two or three blocks away. (Tr. 22.) She felt unsafe driving further because of the haziness from her medication. (*Id.*) Her husband did the dishwashing, sweeping, mopping, and vacuuming. (Tr. 29.) Plaintiff did not regularly visit friends or relatives, or entertain visitors. (Tr. 23, 30.)

## V.    <u>Vocational Expert Testimony</u>

At Plaintiff's administrative hearing on January 27, 2012, the ALJ called on vocational expert ("VE"),Victor Girard Alberigi, to testify regarding which occupations might be available in the national economy to someone with limitations like Plaintiff's, and whether Plaintiff's limitations might allow her to pursue her previous employment. (Tr. 40-49.) The VE first classified Plaintiff's previous work under the *Dictionary of Occupational Titles* ("*DOT*"): Plaintiff had worked as a retail sales clerk, a supervisor of food checkers and cashiers, an administrative assistant, and a contractor administrator. (Tr. 41-43.) All the positions were classified as either light or sedentary work. (*Id.*) Save for the position as a retail sales clerk, which was semi-skilled, Plaintiff's former occupations were all classified as skilled work. (*Id.*)

The ALJ then described a hypothetical worker for the VE. This worker could lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for approximate four hours out of an eight-hour workday, and sit without limitation, with normal breaks. (Tr. 43.)

She could never climb ladders, ropes, or scaffolds, could occasionally climb ramps and stairs or crawl, and only had a limited field of vision to use. (Tr. 44.) She was limited to simple routine tasks, must work in a low stress job -- defined as one where decision-making was only occasionally required -- and could only tolerate occasional interaction with either coworkers or the public. (*Id.*) The VE testified that this hypothetical would eliminate all skilled work and consequently all of Plaintiff's past relevant work. (*Id.*) The hypothetical also excluded all light work, which by a purist standard involved walking or standing two-thirds of the day. (Tr. 45.) However, the VE also noted that he had observed certain jobs classified as light performed with less than light activity. (Tr. 45, 46.)

The VE testified that given these limitations, the Plaintiff could find work as a parking lot or garage cashier, a small products assembler, or an order clerk. (Tr. 45-47.) The positions were all unskilled, with numbers in the New York metropolitan area ranging from nearly 3,000 to over 97,000. (*Id.*) The first two positions were formally classified as light work, but could be performed at a sedentary level, by the VE's observation. (Tr. 46.) The VE noted that modifying the work to be sedentary by, for example, adding a sit/stand option, departed from the standards of the *DOT* and the revised *Selected Characteristics of Occupations*. (Tr. 49.)

The ALJ then asked the VE if, given the same hypothetical limitations, but with the additional caveat that the worker would regularly take numerous 30-minute breaks throughout the day, there would be work open to the Plaintiff.[11] (Tr. 48-49.) The VE testified that most employers allowed two to three unscheduled absences a month at most, as well three breaks a

---

[11] The record of the administrative hearing indicates that the ALJ suggested a break "every minute for 30 minutes," which the Court interprets to mean very frequent 30-minute breaks. (Tr. 48.)

day for morning, lunch, and afternoon, plus bathroom breaks.  (Tr. 47-48.)   Most employers

would not tolerate as many breaks as the ALJ suggested, unless by accommodation.  (Tr. 49.)

## STANDARD OF REVIEW

### I.      District Court's Review of the Administrative Decision

In reviewing a final decision of the Commissioner, the Court's duty is to determine

whether it is based upon correct legal standards and principles and whether it is supported by

substantial evidence in the record, taken as a whole.  *See Talavera v. Astrue*, 697 F.3d 145, 151

(2d Cir. 2012) (the Court "is limited to determining whether the [Social Security

Administration's] conclusions were supported by substantial evidence in the record and were

based on a correct legal standard").  "'Substantial evidence is more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*,

402 U.S. 389, 401 (1971)) (alterations and internal quotation marks omitted).  In determining

whether the Commissioner's findings were based upon substantial evidence, "the reviewing court

is required to examine the entire record, including contradictory evidence and evidence from

which conflicting inferences can be drawn."  *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.

1983) (citations omitted).  However, the Court is mindful that "it is up to the agency, and not this

court, to weigh the conflicting evidence in the record."  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d

115, 118 (2d Cir. 1998).  Under any circumstances, if there is substantial evidence in the record

to support the Commissioner's findings as to any fact, they are conclusive and must be upheld.

42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

### II.     Disability Under the Social Security Act

The Social Security Act ("the Act") provides that an individual is disabled if he or she is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify for Social Security disability benefits, the claimed disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(D); *accord Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).

The Act's regulations prescribe a five-step process for the evaluation of disability claims. First, the Commissioner determines whether the claimant currently is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) (2015).

If the claimant is not currently engaged in "substantial gainful activity," the Commissioner proceeds to the second step, which is whether the claimant suffers from a medical impairment, or combination of impairments, that is "severe," meaning that the impairment "significantly limits [claimant's] physical or mental ability to do basic work activities." If the impairment is not severe, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii), (c).

If the impairment is severe, the Commissioner proceeds to the third step, which is whether the impairment meets or equals one of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Act's regulations (the "Listings"). If so, the claimant is presumed disabled and entitled to benefits. 20 C.F.R. § 404.1520(a)(4)(iii).

If the impairment does not meet or equal a listing in Appendix 1, the Commissioner proceeds to the fourth step, which is whether, despite the claimant's severe impairment, he has the "residual functional capacity" ("RFC") to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's RFC is used to assess whether he or she can perform one of the five categories of work recognized by Social Security Administration ("SSA") regulations (listed

here in order of decreasing rigor): very heavy, heavy, medium, light and sedentary. 20 C.F.R. § 404.1567(a). Sedentary is the least rigorous of the five categories. *Schaal v. Apfel*, 134 F.3d 496, 501 n. 6 (2d Cir.1998) (citing 20 C.F.R. § 404.1567). In determining a claimant's RFC, the Commissioner considers all medically determinable impairments, even those that are not "severe." 20 C.F.R. § 404.1545(a). If the claimant's RFC is such that s/he can still perform past work, the claimant is not disabled.

If the claimant cannot perform past work, the Commissioner proceeds to the fifth and final inquiry, which is whether, in light of the claimant's RFC, age, education, and work experience, the claimant has the capacity to perform other substantial gainful work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant has such capacity, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. *Id.*

The claimant bears the burden of proving her case at steps one through four; at step five, the burden shifts to the Commissioner to establish that there is substantial gainful work in the national economy that the claimant could perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

## DISCUSSION

### I.    The ALJ's Decision

Plaintiff applied for disability insurance benefits on July 21, 2010, alleging disability beginning May 1, 2010. (Tr. 133.) The application was initially denied on January 4, 2011. (Tr. 58.) Plaintiff requested an administrative hearing on February 24, 2011. (*Id.*) On January 27, 2012 Plaintiff appeared before ALJ Moises Penalver via video conference, Plaintiff appearing in Staten Island, and ALJ Penalver presiding in New York. (*Id.*)

The ALJ initially determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of the disability. The ALJ found that Plaintiff suffered from the

following severe impairments: status post-1992 CVA, *i.e.*, stroke, headaches, and depression. The ALJ also found that Plaintiff had one non-severe impairment, a blood disorder from protein-S deficiency. (Tr. 60.) The ALJ then found that none of these impairments or their combination met or medically equaled the severity of any of the impairments in the Listings. (Tr. 61.) Consequently, the ALJ assessed Plaintiff as having the RFC to perform a reduced range of light, unskilled work. (*Id.*) Specifically, the ALJ found that the Plaintiff could "lift and/or carry up to twenty pounds occasionally and 10 pounds frequently," could stand or walk up to half of an 8-hour workday, and could occasionally climb ramps or stairs and crawl. (*Id.*) The ALJ further found that Plaintiff could not climb ladders, ropes or scaffolds, and "must avoid all exposure to dangerous moving machinery" and "unprotected heights." (*Id.*) Additionally the ALJ determined that Plaintiff was limited to working in occupations requiring only occasional peripheral acuity and involving only a low stress environment, which was defined as requiring only occasional decision-making. (*Id.*) Lastly, the ALJ found that Plaintiff could only tolerate occasional interaction with either the public or co-workers, which could only be superficial and brief. (*Id.*)

The ALJ gave three representative occupations that Plaintiff could perform with her residual functional capacity ("RFC"), as listed by the VE at the hearing: parking-lot cashier, small products assembler, and order clerk. (Tr. 65.) The ALJ found that these jobs existed in significant numbers in the national economy. (*Id.*) The ALJ also determined that the VE's testimony was consistent with the *DOT*.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on July 9, 2013. (Tr. 1.) This action followed.

## II.    The ALJ Failed to Comply with the Treating Physician Rule

"Regardless of its source," Social Security regulations require that "every medical opinion" in the administrative record be evaluated when determining whether a claimant is disabled under the Act.  20 C.F.R. §§ 404.1527(d), 416.927(d).  "Acceptable medical sources" that can provide evidence to establish an impairment include, *inter alia*, Plaintiff's licensed treating physicians and licensed or certified treating psychologists.  *See* 20 C.F.R. §§ 404.1513(a), 416.913(a).

Social Security regulations require that the ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) is not inconsistent with the other substantial evidence in [the] case record." *Lucas v. Barnhart*, 160 F. App'x 69, 71 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Rosa v. Callahan*, 168 F.3d 72, 78–79 (2d Cir. 1999).  Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool." *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (citation omitted).

It bears emphasis that "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Correale–Englehart v. Astrue*, 687 F. Supp. 2d 396, 427 (S.D.N.Y. 2010) (citing *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  The preference for a treating physician's opinion is generally justified because "[such] sources are likely to be [from] the medical professionals most able to provide a detailed, longitudinal picture of [the Plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). By the same token, the opinion of a consultative physician, "who only examined a Plaintiff once,

should not be accorded the same weight as the opinion of [a] Plaintiff's treating [physician]." *Anderson v. Astrue*, 07 CV 4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (citing *Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 282–83 (E.D.N.Y. 2005)). This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Id.* (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)). In addition, opinions of consulting physicians—whether examining or non-examining—are entitled to relatively little weight where there is strong evidence of disability on the record, or in cases in which the consultant did not have a complete record. *Correale–Englehart*, 687 F. Supp. 2d at 427.

Pursuant to the ALJ's duty to develop the administrative record, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79 (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.")). Thus, "if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." *Correale–Englehart*, 687 F. Supp. 2d at 428.

If the ALJ did not afford "controlling weight" to opinions from treating physicians, he needed to consider the following factors: (1) "the frequency of examination and the length, nature and extent of the treatment relationship;" (2) "the evidence in support of the opinion:" and (3) "the opinion's consistency with the record as a whole;" and (4) whether the opinion is from a specialist." *Clark*, 143 F.3d at 118; *accord Burgess*, 537 F.3d at 128 (2d Cir. 2008). Furthermore, when a treating physician's opinions are repudiated, the ALJ must

"comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (per curiam ); *see Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(d)(2) (stating that the Social Security agency "will always give good reasons in [its] notice of determination or decision for the weight [given to a] treating source's opinion") (emphasis added). "The failure to provide 'good reasons' for not crediting a treating source's opinion is ground for remand." *See Burgin v. Astrue*, 348 F. App'x 646, 648 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33 (stating that the Second Circuit will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and ... will continue remanding when [the Second Circuit] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.") (changes in original omitted)).

The ALJ incorrectly applied these principles in this case. The ALJ rejected or failed to consider key findings of Plaintiff's treating sources, and instead relied largely on the opinions of the agency's consulting physicians, as well as an agency psychiatry reviewer. In so doing, the ALJ failed to comply with Social Security regulations that require him to address the evidence supporting the treating doctors' opinions, provide good reasons for why he was rejecting or giving lesser weight to Plaintiff's treating sources' opinions, and adequately develop the record.

A.      **Plaintiff's Mental Impairments (GAF)**

Regarding Plaintiff's mental impairments, the administrative record reflects that Plaintiff was treated by psychiatrist Dr. Breving from April 29, 2011 to December 19, 2011, and social worker Ms. Fried from April 2, 2011 to January 18, 2012. (Tr. 343-48; 349-59.) The ALJ departed from the treating physician rule with respect to Dr. Breving's opinion by according little weight to the portions of the opinion that disagreed with the ALJ's assessment of Plaintiff's

disability, and only crediting Dr. Breving where the ALJ believed the opinion to be in favor of a finding of no disability. Rather, the ALJ should have given controlling weight to Dr. Breving's opinion, unless there existed "good reason" not to do so, which the ALJ was required to explain. *See Snell*, 177 F.3d at 133 ("Failure to provide explicit 'good reasons' for not crediting a treating source's opinion is a ground for remand.")

Here, the ALJ relied on Dr. Breving's assessment of Plaintiff's GAF as a 75 as a basis for giving little weight to the rest of Dr. Breving's opinion. While the ALJ correctly noted that Plaintiff's GAF score of 75 indicated that her symptoms were "transient and exceptable reaction to psychosocial stressors, which would cause her no more than slight impairment in social or occupational functions", (Tr. 63; DSM-IV-TR at 34), a claimant's GAF score is insufficient evidence to invalidate a treating physician's other clinical findings. *See Santiago v. Colvin*, 12 CV 7052, 2014 WL 718424, at *20 n.10 (S.D.N.Y. Feb. 25, 2014) ("The [SSA] Commissioner has made clear that the GAF scale does not have a direct correlation to the severity requirements contained in the [regulations] that the ALJ considers [to determine whether the claimant has a per se disability].") (citing *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50746–01, 50764–65, 2000 WL 1173632 (August 21, 2000).[12] The ALJ improperly rejected Dr. Breving's clinical findings of Plaintiff's mental impairments out-of-hand. Dr. Breving reported that Plaintiff suffered from major depressive disorder that was moderate and recurrent. (Tr. 343.) On the December Mental Impairment Questionaire, Dr. Breving opined that plaintiff's condition was expected to last at least 12 months, and that her impairment would cause her to be absent from work about once a month.

---

[12] Furthermore, "[t]he GAF scale was removed for the fifth edition of the DSM, which was published in 2013, because of the GAF's 'conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Corporan*, at *12 n.9 (citing Diagnostic and Statistical Manual of Mental Disorders ("DSM-V-TR") at 16 (5th ed., 2013)).

(Tr. 346.)  Dr. Breving assessed Plaintiff as having numerous functional limitations from her depression, to which the ALJ gave little weight, despite the direct bearing that those opinions have on the requirements for disability under the SSA's regulations.  (Tr. 347; 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.04(A)(1), (B).)  Dr. Breving's opinion also asserted that Plaintiff would have limited social and mental ability to do work, *e.g.*, that she would not be able to organize and set realistic goals.  The ALJ's opinion failed to address these issues, or provide any justification for ignoring them.  (Tr. 346; 63.)  Rather, the ALJ's selective reliance on the medical findings of Dr. Breving as a treating source, while failing to credit his other findings, without providing good reasons for doing so, is clearly erroneous.

The Court also finds that the ALJ erred by discounting the opinion of Ms. Fried, Plaintiff's social worker.  The ALJ gave little weight to Ms. Fried's opinion because "her contact with [Plaintiff] was sporadic and as a social worker she is not a medically acceptable source under the Regulations[.]"  (Tr. 63.)  While the ALJ was correct in finding that Ms. Fried did not constitute a "medically acceptable source under the Regulations[,]" (Tr. 63,) he should have considered her opinion as "other source evidence.  20 C.F.R. § 416.913(d); *see Mitchell v. Colvin*, No. 09 CV 5429, 2013 WL 5676289, at *8 (E.D.N.Y. Oct. 17, 2013) ("Although they are not 'acceptable medical sources,' therapists and social workers are 'other sources' whose opinions must be considered by an ALJ."); *White v. Commissioner of Social Security*, 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004) (finding error in ALJ's failure to give appropriate weight to opinion of plaintiff's social worker).  Thus, Ms. Fried's opinion may be used "to show the severity of [Plaintiff's] impairment(s) and how it affects [her] ability to work," especially since Ms. Fried's opinion corroborates Dr. Breving's opinion.  *See* Social Security Ruling 06–03p, 2006 WL 2329939, at *2 (Soc. Sec. Admin. Aug, 9, 2006) (stating evidence from "other

sources," such as licensed clinical social workers, may be considered to show the severity of an individual's impairment and how it affects the individual's ability to function).The ALJ also stated that Ms. Fried's opinion was only entitled to "little weight" because her contact with Plaintiff was "sporadic," but the record shows that Ms. Fried saw Plaintiff seven times from April 2011 to December 2011.  (Tr. 357-59.)  In contrast, Dr. Breving saw Plaintiff monthly from April 2011 to December 2011—the same period.  Accordingly, the Court finds that the ALJ erred by not according greater weight to Ms. Fried's opinion.

### B.    Plaintiff's Physical Impairments

The ALJ also failed to properly apply the treating physician rule with respect to Plaintiff's physical impairments.  Plaintiff was treated by neurologist Dr. Ng from November 5, 2009 to February 17, 2012, for the ongoing management of her blood disorder and related headaches. Dr. Ng's office provided complete medical records regarding Plaintiff's visits on and around her onset date, which contained Dr. Ng's various diagnoses and treatment plans, including, *inter alia*, his direction that Plaintiff attend the Coumadin clinic for lifelong anticoagulant therapy.  (Tr. 296-311.)  However, the ALJ did not expressly accord any weight to Dr. Ng's opinion, presumably because Dr. Ng did not make any explicit findings or recommendations regarding Plaintiff's ability to work and any relevant limitations.  However, an ALJ may not discredit a treating source's reports on the basis that the report did not offer an opinion regarding Plaintiff's ability to engage in work activities.  *See Rosa*, 168 F.3d at 79 (concluding that is was error for the ALJ to attach significance to omissions by the treating physician rather than seek more information).   Rather, under the treating physician rule, the ALJ had an affirmative duty to develop the medical record where necessary.  *Id*.  If an ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are

incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request the missing information from the physician. *Correale-Englehart*, 687 F. Supp. 2d at 428. To the extent that the ALJ believed that Dr. Ng's opinion was deficient for not opining on Plaintiff's ability to work, he was required to "seek additional evidence or clarification" from Dr. Ng as a treating medical source. *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (citing C.F.R. 404.1512(e)(1)). The record of the administrative hearing indicates that while the ALJ asked Plaintiff's attorney to provide an assessment of Plaintiff's physical limitations from either her primary care physician or neurologist (Tr. 51), he only wanted "something to point to to state why the [Plaintiff] has these physical limitations that I think she would have as I stated in my hypothetical." (Tr. 51-52.) Thus, instead of seeking out Dr. Ng's opinion of Plaintiff's physical limitations, the ALJ was only interested in information that confirmed his own previously formed conclusions.

Subsequently, the ALJ was satisfied to draw his conclusions based on Dr. Ng's short letter, which is quoted in its entirety above, despite its lack of explanation for Plaintiff's symptoms, much less a discussion of Plaintiff's ability to do work-related activities. The ALJ erred by not seeking clarification and supplementation from Plaintiff's treating physicians and instead using Dr. Ng's letter as a peg to "hang [his] hat on" and justify the ALJ's preconceived view about Plaintiff's lack of disability. (*Id.*) The ALJ should have required more testimony from Dr. Ng as to how Plaintiff's headaches would affect Plaintiff's ability to work, if at all. Having received a complete opinion, the ALJ could have then determined how much weight to accord it.

### III.    The ALJ Erred by Discounting Claimant's Credibility

Plaintiff argues that the ALJ erred in finding Plaintiff's testimony not credible. The Court agrees. In assessing whether a claimant is disabled, the ALJ may consider the claimant's

allegations of pain and functional limitations; however, the ALJ retains the discretion to assess the claimant's credibility. *See Fernandez v. Astrue*, 11 CV 3896, 2013 WL 1291284, at *18 (E.D.N.Y. Mar. 28, 2013) (citing *Taylor v. Barnhart*, 83 Fed. App'x 347, 350 (2d Cir. 2003); *Correale–Englehart*, 687 F. Supp. 2d at 434). The SSA regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must decide whether the claimant suffers from "a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." 20 C.F.R. § 404.1529(b). Second, where the record shows that the claimant has such a medically determinable impairment, the ALJ evaluates "the intensity and persistence of [the claimant's] symptoms [to] determine" the extent to which they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c); *see also Fernandez*, 2013 WL 1291284, at *18.

Where the ALJ finds that the claimant's testimony is inconsistent with the objective medical evidence in the record, the ALJ must evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)–(vii).

Here, the ALJ committed error by failing to adhere to the two-step inquiry prescribed in the regulations. The ALJ's decision dismisses Plaintiff's testimony about her pain based solely on her testimony about her daily activities. (*See* Tr. 63 (finding Plaintiff's statements regarding her daily activities rendered her "not fully credible" and that they did not show her to be

"incapable of a range of light, unskilled work."))  By deeming Plaintiff's testimony not credible solely on the basis of her daily activities, instead of engaging in the two-step inquiry, the ALJ erred.  *See Bialek v. Astrue*, 11 CV 5220, 2013 WL 316165, at *4 (E.D.N.Y. Jan. 28, 2013) (finding the ALJ improperly discounted the claimant's testimony based on testimony regarding his daily activities).  At a minimum, ALJ should have determined whether Plaintiff suffered from "a medically determinable impairment that could reasonably be expected to produce the symptoms" Plaintiff testified to at the hearing—which, as discussed *infra*, the record did establish.  Furthermore, the ALJ did not consider the other six factors set forth in 20 C.F.R. § 404.1529(c)(3) before deeming Plaintiff's testimony not credible.  *See Fernandez*, 2013 WL 1291284, at *19 (noting ALJ erred by failing to evaluate the plaintiff's testimony in light of the seven factors required by SSA regulation).

Because the ALJ's credibility determination rested solely on Plaintiff's testimony regarding her ability to engage in daily activities, the Court finds that it was not based on substantial evidence.  A claimant "does not need to be an invalid in order to be found disabled." *Monroe v. Astrue*, 12 CV 1456, 2014 WL 3756351, at *7 (E.D.N.Y. July 30, 2014) (citing *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998)).  Indeed, a claimant's ability "to tend to his personal needs and travel to appointments is not indicative of his ability to perform light work." *Bialek*, 2013 WL 316165, at *4; *see also Martin v. Astrue*, 2009 WL 2356118, at *12 (S.D.N.Y. July 30, 2009) (stating that the claimant's ability to engage in "mundane tasks of life . . . do[es] not necessarily indicate that [a claimant] is able to perform a full day of sedentary work.").  While Plaintiff did engage in the daily activities of raising two children, driving a car locally, and performing some household duties with the help of her husband (Tr. 188-191), such conduct does not show that Plaintiff is capable of performing full-time light work, or that Plaintiff's

testimony about the degree of impairment she otherwise suffered was not credible.  *See Fernandez*, 2013 WL 1291284 at *19–20 (rejecting the Commissioner's argument that the ALJ's adverse credibility determination was supported by substantial evidence based on the plaintiff's engagement in daily activities).

In fact, Plaintiff's testimony is consistent with the opinion of her treating physicians.  She testified that her headaches were severe, and that she had repeatedly experienced them since her second stroke in 2009.  (Tr. 24.)[13]  She took Ultram by prescription two to three times a week to control her pain, which she rated as a seven or eight on a ten-point scale of pain.  (Tr. 25.)  She testified that since her physician had increased her dosage from 50 to 100 milligrams of Ultram, she suffered dizziness and grogginess as a side effect of the medication, such that she could not function and had to lie down for at least an hour after taking the medication.  (Tr. 25-26.)  This is consistent with Dr. Ng's statement that he was using Ultram to treat Plaintiff for severe headaches, occurring four to five times a month and the known side effects of Ultram.[14]  Additionally, the ALJ did not believe that Plaintiff had a second stroke in 2009, mentioning where the record "suggests" another stroke, only to describe all Plaintiff's other normal

---

[13] The ALJ appears not have seen or credited Dr. Ng's diagnosis that Plaintiff had a second stroke in 2009.  (Tr. 62 mentioning where the record "suggests" that Plaintiff had a second stroke in 2009, but focusing on Plaintiff's other normal neurological results.)  This failoure to follow the treating physician rule potentially contributed to the ALJ's improper assessment of plaintiff's credibility.

[14] Dr. Ng's letter says Plaintiff is taking "Tramadol," which is the generic name for Ultram.  (Tr. 360.)  *See* www.drugs.com/tramadol.html (last visited on August 18, 2015).  Ultram's very common side effects include, *inter alia*, dizziness and somnolence.  *See* www.drugs.com/sfx/tramadol-side-effects.html (last visited on August 18, 2015).  The Court also notes that the ALJ could have sought more information from Plaintiff's primary care physician, Dr. Auyeung, who prescribed Plaintiff Ambien for her sleep disorders.  (Tr. 219.)  Plaintiff testified that the Ambien made her unable to drive in the morning, with a drugged feeling on waking.  (Tr. 22.)  Ambien's reported side effects include a drugged feeling and excessive sedation.  *See* www.drugs.com/sfx/ambien-side-effects.html (last visited on August 18, 2015).

neurological results. (Tr. 62.) Presumably, the ALJ did not recognize that Dr. Ng's diagnosis of a CVT, which the ALJ noted, was, in other words, a diagnosis of a stroke. This indicates that not only was the ALJ was failing to follow the treating physician rule and wrongly discounting the plaintiff's credibility, but that the ALJ was substituting his own judgment of Plaintiff's limitations for that of acceptable medical sources.

Finally, Plaintiff correctly argues that the ALJ erred by failing to evaluate Plaintiff's long work history of 25 years when making his credibility assessment. (Tr. 149.) "A plaintiff with a good work history is entitled to substantial credibility when claiming inability to work." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983). Plaintiff's 25-year work history entitled her to substantial credibility. *See Fernandez*, 2013 WL 1291284 at *20 (finding that plaintiff was entitled to substantial credibility based on a 25-year work history). Though work history is but one factor that contributes to a credibility assessment, the ALJ erred by not considering Plaintiff's work history at all. *See Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 61 Fed. Reg. 34,483, at 34,486 (listing numerous factors for assessing a plaintiff's credibility, including prior work record).

IV.    **The ALJ's RFC Determination Was Not Supported by Substantial Evidence**

As discussed above, the ALJ determined Plaintiff's RFC by adopting the testimony of the non-examining medical experts and disregarding, or selectively relying on, the opinions of Plaintiff's treating physicians. Accordingly, the ALJ's RFC determination was not supported by substantial evidence.

Plaintiff's treating psychiatrist Dr. Breving found that Plaintiff was mentally ill-suited to working among co-workers, based on various limitations arising from her depression. (Tr. 344-45.) Dr. Ng, Plaintiff's treating neurologist, opined that Plaintiff had severe headaches that seemed to be kept under control by her medication, but did not otherwise express an opinion as

to Plaintiff's ability to work. The ALJ's decision that Plaintiff could do light, unskilled work rested largely on Dr. Govindaraj's consultative examination of Plaintiff, which cleared her for work without restriction. (Tr. 64, 315.) The ALJ assigned great weight to Dr. Govindaraj's opinion, on the basis that the consulting doctor's normal findings were supported by the otherwise normal neurological assessments in 2009, stressing that there was no "objective proof of a recurring CVA." (Tr. 64.) However, Dr. Govindaraj's examination on December 14, 2010 was his only contact with Plaintiff. (Tr. 312.) Though he opined that Plaintiff's central nervous system was normal, he did not issue any opinions as to her headaches. (Tr. 314.) Thus, the only support for the ALJ's RFC were the findings of consulting physician, which contradicted the opinion of Plaintiff's treating neurologist as to whether she suffered a stroke in 2009. Accordingly, the ALJ's RFC was not supported by substantial evidence, and warrants re-consideration on remand. *See McKissick v. Barnhart*, 01 CV 1550, 2002 WL 31409933, at *16 (finding the Commissioner's decision was not supported by substantial evidence where treating physician evidence contradicted the opinion of non-treating physician).

Even as to the agency's own consultative physicians, the ALJ selectively relied on their opinions so as to support his decision. For example, the ALJ gave significant weight to consulting psychiatrist Dr. Sankar's opinion that Plaintiff had "no major psychiatric problems" (Tr. 318), yet disregarded Dr. Sankar's opinion that Plaintiff could not maintain a regular schedule or learn new tasks as inconsistent (Tr. 64), without providing any reason for this selective use of the consultative physician evidence.

As previously discussed (*see supra* footnote 17), it also appears that the ALJ did not believe that Plaintiff had a second stroke in 2009, as diagnosed by Dr. Ng. This failure to credit Dr. Ng's opinion amounts to the ALJ substituting his own judgment with respect to Plaintiff's

limitations for that of acceptable medical sources, and warrants remand. *Rosa,* 168 F.3d at 79 ("In analyzing a treating physician's report, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.") (quoting *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)); *see also Wagner v. Secretary of Health and Human Servs.*, 906 F.2d 856, 862 (2d Cir. 1990) ("[A] circumstantial critique by [a] nonphysician[ ], however thorough or responsible, must be overwhelmingly compelling to justify a denial of benefits").

Lastly, the ALJ erred by misrepresenting the VE's testimony to assert that there was work to be found in significant numbers for those with Plaintiff's limitations. In response to the hypothetical limitation that Plaintiff would need frequent 30-minute breaks, the VE testified that employers would not tolerate more than the three standard breaks and occasional bathroom breaks in a work day, except by accommodation. (Tr. 49.) The ALJ's decision, however, failed to acknowledge or address Plaintiff's need for more work breaks than a typical employer would permit without accommodation. (Tr. 49, 63. ("There is nothing in the record showing that the claimant is incapable of a range of light, unskilled work.")) In addition, Social Security regulations require that the ALJ must use representative occupations that conform to the descriptions found in the *DOT*. *See* Social Security Ruling 00-4P, 2000 WL 1898704, at *4 (Dec. 4, 2000) ("SSR 00-4P"). Yet, the VE testified that the accommodations needed for Plaintiff to perform light work would depart from the strict standards of the *DOT*. (Tr. 49.) Thus, the ALJ erred by failing to resolve the conflict in his decision, as required by SSA regulations. SSR 00-4P, at *4.

## V.    <u>Remedy</u>

Accordingly, the Court remands this action, instructing the ALJ to develop the record, determine whether the opinions of Plaintiff's treating physicians deserve controlling weight, and if applicable, articulate reasons for according less than controlling weight to these opinions.

Although Plaintiff's cross-motion addresses only the core issues of the ALJ's misapplication of the treating physician rule and improper assessment of Plaintiff's credibility, the Court additionally notes that the ALJ failed to meaningfully consider the combined effect of Plaintiff's mental and physical impairments, *i.e.*, depression, headaches, and grogginess from medication side effects, as found by her treating physicians. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c) (requiring a determination of whether the claimant suffers from a medical impairment, or *combination* of impairments, that is "severe").  Thus, on remand, the ALJ should also consider the effects of Plaintiff' combined impairments at every step of the five-step sequential analysis.

After developing the record and according the appropriate weight to the various medical sources on the record, the ALJ should additionally reassess Plaintiff's credibility with reference to the factors listed in 20 C.F.R. § 404.1529(c)(3)(i)-(vii).  To the extent the ALJ discredits Plaintiff's statements concerning her pain or the intensity, persistence and limiting effects of her impairments, the ALJ should indicate how he assessed and balanced the various factors.

Lastly, the ALJ should adequately develop the record with respect to, and explain the bases for, his RFC assessment.  Among the information that the ALJ is required to obtain from a treating source at stage five of the analysis is "a statement of what [the claimant] can still do despite [her] impairment(s) based on her acceptable medical sources' findings on her factors under paragraphs (b)(1) through (b)(5) of this section."  20 C.F.R. § 404.1513(b) (6).  The ALJ must also adequately explain the reasoning underlying his RFC determination and the basis on which it rests.  *See, e.g.*, *Correale–Englehart*, 687 F. Supp. 2d at 440 (citing cases).

## CONCLUSION

For the reasons set forth above, the Court denies the Commissioner's motion for judgment on the pleadings and grants Plaintiff's cross-motion. Pursuant to the fourth sentence of 42 U.S.C. 405(g), the Commissioner's decision is remanded for further consideration and new findings consistent with this Memorandum & Order. The Clerk of Court is respectfully requested to enter judgment accordingly.

SO ORDERED.

_/s/ Pamela K. Chen_
Pamela K. Chen
United States District Judge

Dated: August 20, 2015
Brooklyn, New York